## TAYLOR v. WADDOUPS et ux.
## TAYLOR et al. v. WADDOUPS et ux.

Nos. 7720, 7745.  Decided March 3, 1952.  (241 P. 2d 157.)

See 2 C. J. S., Adoption of Children, sec. 21. Custody of children, welfare determining. 17 Am. Jur., Divorce and Separation, sec. 683.

*William G. Shelton, Benjamin Spence,* Salt Lake City, for appellant.

*L. E. Nelson,* Logan, for respondents.

WOLFE, Chief Justice.

Appellant, LaPriel Taylor, sought a writ of habeas corpus in the District Court to obtain custody of her children from the respondents, Mr. and Mrs. Waddoups. This appeal is taken from a judgment denying the writ of habeas corpus in part and a judgment approving the adoption (hereinafter considered) in part, granting the custody of Linda Kay, Sheryl Rae and Karen, to respondents and permitting Howard Wayne to return to his mother. The two cases

were consolidated for trial and this appeal. LaPriel Taylor, the mother of the children, will be called the plaintiff, and Mr. and Mrs. Waddoups, the adoptive parents, will be called the defendants.

The plaintiff became married to Howard C. Taylor in 1940 and obtained a divorce in 1944. She remarried him in 1946 and obtained a second divorce in December of 1950. Five children were born as a result of this marriage whose ages at the date of trial were: Howard Wayne, age 10; Linda Kay, age 9; Sheryl Rae, age 3; Karen, age 2, and a baby born in November of 1950 not concerned in this action. Throughout their marriage, Mr. Taylor was very unstable and irresponsible and failed to support his family. He deserted his family intermittently, forcing the plaintiff to go to her parents' home in Nibley, Utah, and obtain assistance from the county welfare until she could gain employment. From September, 1948 until December, 1950, the plaintiff was suffering from very poor health and was unable to work or support herself and her children. On June 1, 1949, plaintiff inquired of the Cache County Department of Public Welfare for a suitable home in which to place her children, and after investigating one or two families she placed three of her children, Howard, Linda and Karen, with the defendants who were plaintiff's second cousins and resided in Logan, Utah. The Cache County Department of Public Welfare supported them in the defendants' home from June 1, 1949 to about January 15, 1950. Sheryl Rae was left with an aunt of the plaintiff's during most of this time. On June 1, 1949, plaintiff went to California to join her husband and try and effect a reconciliation and to persuade him to fulfill his duty of support. Mr. Taylor and plaintiff returned to Cache County around the 1st of October, 1949. Mr. Taylor lived with the plaintiff at her parents' home for approximately two months, when he deserted her again.

On or about the 15th day of January, 1950, the plaintiff moved to Ogden and took her four minor children with her.

She rented an apartment but, due to her impaired health and because the deserting father would not support them, she obtained assistance for her family from the Weber County Department of Public Welfare. Her physical condition grew worse. Once or twice a day she would have fainting spells due to acute anemia caused from hemorrhages. Because of this condition, her parents took two of the children during the latter part of February. On or about the 1st day of March, the defendants, Mr. and Mrs. Waddoups, went to the plaintiff's home where plaintiff stated if they "wanted some children, she had some to give away." Plaintiff's spirit and courage had apparently become exhausted. The parties then agreed that the defendants would adopt the four children.

The defendants returned to plaintiff's home on March 9, 1950 with a prepared "Consent to Adoption" and plaintiff and her husband were both present. They examined the adoption agreement for an hour or more and then signed it before a notary public and surrendered the children to the defendants. Prior to the time that plaintiff signed the consent of adoption, she stated and the defendants agreed that if her health improved so that she could care for her children they were to be returned to her. The plaintiff then moved to Salt Lake City and the children were taken to the defendants' home in Logan, Utah.

On November 28, 1950, a fifth child was born to the plaintiff and on that date the operation was performed which was necessary to correct plaintiff's ill health. During the summer and fall of 1950, the plaintiff made three or four visits to the defendants' home and on each occasion expressed satisfaction with the condition of the children and the manner in which the defendants were caring for them. On the 8th of December, 1950, the plaintiff informed defendants that her health was considerably improved and that she wished the children returned to her, but the defendants refused. A week later plaintiff was granted her second divorce from her husband. Since the date of the hearing in the

trial court, the interlocutory divorce period has expired, the divorce decree became final and plaintiff has married a Mr. Kernoff Christensen. He testified at the trial they were engaged to be married; that he is a welder by trade with a regular weekly income of $80.00, that he owns an adequate home for all five children in Granger, Utah, and is desirous of becoming the foster father of the children.

The consent to adoption signed by plaintiff March 9, 1950 was not filed in the District Court until January 5, 1951. On January 8, 1951, without giving notice to plaintiff or her husband, the court signed and entered the order of adoption changing the children's surname to Waddoups. An Order for a Writ of Habeas Corpus was issued February 26, 1951 and on April 22nd the court granted plaintiff's motion to vacate the order of adoption. A hearing was had and on May 28th the court entered its findings of fact and conclusions of law awarding Howard Wayne to the plaintiff, and Linda, Karen and Sheryl to the defendants. Why the court returned Howard Wayne to the plaintiff is immaterial to this decision.

It is obvious that the so-called consent to adoption was not made in conformity with the governing statutes, which require that it be signed before the district court of the county where the person adopting resides. The relevant provisions of our 1943 Utah Code Annotated state:

*Section 14-4-4:* "A legitimate child cannot be adopted without the consent of its parents, if living, \* \* \* except that consent is not necessary from a father or mother who has been judicially deprived of the custody of the child on account of cruelty, neglect or desertion; *provided,* that the district court may order the adoption of any child, without notice to or consent in court of the parent or parents thereof, whenever it shall appear that the parent or parents whose consent would otherwise be required have theretofore, in writing acknowledged before any officer authorized to take acknowledgments, released his or her or their control or custody of such child to any agency licensed to receive children for placement or adoption under Chapter 3 of this Title, [licensed adoption agencies] and such agency consents, in writing, to such adoption."

*Section 14-4-5:* "A child deserted by its parents or surviving parent and having no legal guardian may be adopted as in this chapter provided, without the consent of either parent, when the district court of the county where the petitioner resides shall determine that it is a deserted child. Any person desiring to adopt a deserted child may petition such district court setting out the facts, agreeing to regularly adopt the child, if found to be a deserted child, and praying that the court determine the fact. * * * [Notice shall be given to the parents or kindred of the child as the court may direct.]"

*Section 14-4-8:* "The person adopting a child and the child adopted, and the other persons whose consent is necessary, must appear before the district court of the county where the person adopting resides, and the necessary consent must thereupon be signed and an agreement be executed by the person adopting to the effect that the child shall be adopted and treated in all respects as his own lawful child."

Formerly this section 14-4-8 contained this additional clause:

"* * * provided, that if the persons whose consent is necessary are not within the county, then their written consent, duly acknowledged in the manner provided for the acknowledgment of deeds, shall be filed at the time of the application for adoption."

Upon the revision of the adoption laws by the 1941 Legislature, this last quoted portion of the statute was deleted. The statute no longer sanctions the relinquishment of a child for adoption before a notary public. Such relinquishment is required to be done before a court. The adoptive parents, the child adopted, and the natural parents, or persons whose consent is necessary, must appear before the district court where the consent must be signed, and the agreement executed that the child shall be treated as the lawful child of the adoptive parents:

*Section 14-4-9:* "The court must examine all persons appearing before it pursuant to the preceding provisions, each separately, and, if satisfied that the interests of the child will be promoted by the adoption, it must make an order declaring that the child shall thenceforth be regarded and treated in all respects as the child of the person adopting."

This indicates that the natural and adoptive parents need not necessarily be present together, but they must all appear before the court and as a part of the same proceeding. This requirement does not apply to situations where the child is released to a child placement agency, 14-4-4, supra, nor to cases where the parent or parents have been judicially deprived of the custody of the child as referred to in sec. 14-4-4; nor to cases where the child has been deserted and the proceeding is under sec. 14-4-5 relating to deserted children.

The purpose of this requirement is that the court, representing the public, can see that the parents when they consent to the adoption of their children are informed and fully understand the effect of the act which they are performing. The court should endeavor to protect the parents from fraud, misrepresentation or undue influence in the obtaining of their consent. Oft times, consents of adoption are signed by parents while under great emotional strain, and, as in this case, they may be signed while the parent is suffering from discouragement and despair. To conduce the welfare of all concerned, this safeguard is established as an assurance that the parents have duly considered the consequence of their act. The Legislature has deemed this contract to be of too great importance to permit it to be signed before a notary public without the benefit of consultation with, and supervision by, a court.

Plaintiff contends that, although adoption statutes are liberally construed, compliance with the provisions of the statute must be substantial and that failure to have the consent to adoption signed before the court in this case renders the subsequent decree of adoption void. The use of the word "void" is unnecessary and undesirable in view of the many decisions written by this court which hold that the interest and welfare of the child be given paramount consideration in all cases involving the custody of children.

No legal consent to the adoption was given by plaintiff. This lack of consent, coupled with the following acts of undoing, entitle the plaintiff to have the children restored to her. Plaintiff notified the defendants that she wished to retake the children in accordance with the parties' oral agreement, as soon as she regained her health. This was nine months after she signed before the notary public. Defendants ignored her request and a month later the purported final adoption decree was signed by the court without affording notice to plaintiff. Promptly thereafter, she filed an affidavit stating under what circumstances the children had been obtained. Within six weeks from the time the decree was signed, she sued out an order for a writ of habeas corpus. Plaintiff's diligent attack on the voidable adoption decree entitles her to regain custody of the children.

Some argument is made that these children were abandoned by the plaintiff and her husband, but the evidence does not bear out such contention. In *Jensen* v. *Early*, 63 Utah 604, 228 P. 217, 220, this court stated:

"Abandonment, in such cases, ordinarily means that the parent has placed the child on some doorstep or left it in some convenient place in the hope that some one will find it and take charge of it, or has abandoned it entirely to chance or to fate. To make arrangements beforehand with some proper and competent person to have the care and custody of the child is not an abandonment of it as that term is ordinarily understood. True, the mere act of giving away the child by the parent into the care and custody of another may militate against him in reclaiming its custody."

Mrs. Taylor left her children with the defendants for the purpose of going to California to effect a reconciliation with her husband, and thereby require the father to provide for the children. Upon her return, she took the children with her to Ogden, but the desertion of her husband and poor health forced her to entrust the care of two of the children to her parents. The children were certainly not

abandoned or deserted at the time that the consent to adoption was signed before the notary public and the defendants took the children from the home of the plaintiff in Ogden. The evidence in this case does not uphold any finding of cruelty, neglect or desertion by the plaintiff upon which the court could judicially deprive her of the custody of the children for such reasons.

To divide the family in accordance with the judgment entered below, would leave Howard Wayne and the baby with their mother and the three intervening children with the Waddoups family. There is a desirability that all the brothers and sisters be reared together in the same family.

The judgments granting the order of adoption and denying the writ of habeas corpus as to Linda Kay, Sheryl Rae and Karen are reversed. The cause is remanding with orders to vacate the adoption decree and grant the writ of habeas corpus, awarding the children to their mother. Costs awarded to appellant.

McDONOUGH and CROCKETT, JJ., concur.

WADE, Justice (concurring specially).

I concur on the ground that plaintiff had effectively revoked her consent to the adoption of these children before it was consummated, and there was no showing that she had deserted them. I express no opinion on the questions discussed by Mr. Justice HENRIOD, or other questions discussed in the prevailing opinion, because I do not consider them necessary for this decision.

HENRIOD, Justice (concurring in the result).

I concur in the result only,—for two reasons: 1) that the purported order of adoption violated Title 14-4-14, U. C. A. 1943, having been entered before the children had lived for one year in the home of the purported adopting parents, and 2) that prior to the filing of the petition for adoption,

the natural mother effectively revoked any consent to adoption that she may have given, a right generally conceded under the authorities, when applied to the facts of this case.

It is respectfully suggested that the remainder of the opinion relating to the consent necessary for adoption invites further confusion to an already confused phase of the law. It is said in the opinion that under 14-4-8, U. C. A. 1943, the person whose consent is necessary must appear before the court and sign the consent where an agency is not involved, but that under 14-4-4, U. C. A. 1943, a parent may give a binding consent to an adoption by merely signing the same before a notary public *if* the child is released to a licensed agency for placement or adoption. To require *physical* appearance in the one case and not in the other, as the opinion establishes, seems to pay little tribute to lawyers, whose advice to natural and prospective adopting parents in my opinion is as wholesome and solid as that of the social service worker.

Admittedly, the main opinion has logical justification for its interpretation that the wording of Title 14-4-8, U. C. A. 1943, after having been amended by Chap. 16, Laws of Utah 1941, deleting that portion of the old statute which allowed for acknowledgment of a consent before a notary public where the natural parent was a non-resident of the county, requires physical presence in court of all interested parties; and such argument may be strengthened by Title 14-4-9, U. C. A. 1943, which requires examination by the court of such persons separately. None the less, the statutes are not entirely free from doubt and are subject to dual interpretation. In such case it is urged that there is good reason to interpret the statute, if possible, so as to carry out the spirit of adoptions generally and simultaneously to pay tribute to practicality and convenience in assuring the adoption by good people of children who otherwise might be the victims of shifting social conditions, obscure status, or onerous procedural difficulties. Viewing it thus, I can

see no reason why we should interpret strictly the word "appear" as synonymous with *"physical* presence." Contrariwise, it would seem that the sensible interpretation thereof would be to endow the word with the connotation with which generally it is attributed,—that of an appearance in court by filing an answer or other pleading, personally or by attorney. One is left to wonder what would happen, if, in a contested adoption proceeding where a non-resident parent whose consent was necessary had filed an answer or other pleading through a local attorney, and thereafter failed or refused to show up at the trial. Requiring *physical* presence would result in a stalemate and there would be no trial, although the court had acquired jurisdiction of person and subject matter in the normal, customary way.

Interpreting the word as has been done in the opinion lends doubt to the statutes of many who have assumed that appearance meant that which has been accepted generally in the profession,—a word of art, as it were, where jurisdiction is conferred upon the court by the filing of a pleading quite unrelated to personal *physical* presence. It is my belief that the legislature, in using the word "appear," had in mind something akin to this generally accepted concept of appearance and did not intend to change the meaning by deleting that portion of Sec. 14-4-8 allowing for acknowledgment of consent by those residing outside of the county of adoption before a notary public. The vice of such deleted portion is apparent since the bench and bar may never have had a chance to learn anything about the natural parent, or would have no jurisdiction over him, as is the case where an appearance is made in the generally accepted meaning of that term.

Such interpretation, as meaningful as that of the main opinion, would provide an orderly procedure for adoption in many meritorious cases, where for one reason or another (such as being in the military service overseas) it would

or may be impossible for a natural parent to present himself physically before the court, although all persons interested could be protected through the good offices of an attorney. It is no answer to suggest that in such case an agency be used, since in the opinion of the writer based on years of experience, prospective parents having the opportunity to adopt a specific child would have little or no chance of succeeding, what with the priority lists of agencies and the reservation of absolute and exclusive rights of placement.